PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

K.C., a minor child, by and
through his mother and next
friend, Africa H.; ALLISON TAYLOR
JOHNS; L.S., a minor child, by and
through his father and next friend,
Ron S.; D.C., a minor child, by
his mother and next friend, Penny
C.,

    *Plaintiffs-Appellees,*

M.S., a minor child, through his
parent and natural guardian,
Rachelle S.,

  *Intervenor/Plaintiff-Appellee,*    No. 12-1575

     v.

PAMELA SHIPMAN, in her official
capacity as Area Director of
Piedmont Behavioral Health Care
Area Mental Health,
Developmental Disabilities, and
Substance Abuse Authority;
PIEDMONT BEHAVIORAL HEALTHCARE
AREA MENTAL HEALTH,
DEVELOPMENTAL DISABILITIES AND
SUBSTANCE ABUSE AUTHORITY, d/b/a
PBH,

    *Defendants-Appellants,*

and

Lanier M. Cansler, in his official
capacity as Secretary of the
Department of Health and Human
Services; Albert A. Delia, in his
official capacity as Acting
Secretary of the Department of
Health and Human Services,

*Defendants.*

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Louise W. Flanagan, District Judge.
(5:11-cv-00354-FL)

Argued: March 21, 2013

Decided: May 10, 2013

Before WILKINSON, KING, and WYNN, Circuit Judges.

Appeal dismissed by published opinion. Judge Wilkinson
wrote the opinion, in which Judge King and Judge Wynn
joined.

**COUNSEL**

**ARGUED:** Wallace Churchill Hollowell, III, NELSON
MULLINS RILEY & SCARBOROUGH, LLP, Raleigh,
North Carolina, for Appellants. Douglas Stuart Sea, LEGAL
SERVICES OF SOUTHERN PIEDMONT, INC., Charlotte,
North Carolina, for Appellees. **ON BRIEF:** Stephen D. Mar-

tin, NELSON MULLINS RILEY & SCARBOROUGH, LLP, Raleigh, North Carolina, for Appellants. Jane Perkins, NATIONAL HEALTH LAW PROGRAM, Carrboro, North Carolina; John R. Rittelmeyer, Jennifer L. Bills, Morris McAdoo, DISABILITY RIGHTS NC, Raleigh, North Carolina, for Appellees.

## OPINION

WILKINSON, Circuit Judge:

Plaintiffs are a class of Medicaid beneficiaries who suffer from severe developmental disabilities. In July 2011, they sued (1) the Secretary of the North Carolina Department of Health and Human Services ("the Secretary" or "the NCDHHS"); (2) Piedmont Behavioral Healthcare ("PBH"), a local subdivision of the state that manages the delivery of plaintiffs' Medicaid services pursuant to a contract with the NCDHHS; and (3) Pamela Shipman, the director of PBH. Plaintiffs alleged that defendants violated their rights under the Medicaid statute and the Due Process Clause of the Fourteenth Amendment by reducing their health care services without notice and an opportunity for a hearing. The district court awarded a preliminary injunction in plaintiffs' favor, ordering defendants to reinstate plaintiffs' services to their prior levels and enjoining defendants from reducing those services without a hearing.

In this appeal, PBH and Shipman challenge the district court's entry of the preliminary injunction. Critically, however, the other defendant in this case—the Secretary of the NCDHHS — did not join in the appeal. Under the Medicaid statute and basic principles of justiciability, the Secretary's decision dictates the disposition of this case. That is because a provision in the statute, 42 U.S.C. § 1396a(a)(5), requires each state to designate a "single State agency" to administer

its Medicaid plan (here, the NCDHHS) and a regulation prohibits PBH from "chang[ing] or disapprov[ing] any administrative decision of that agency," 42 C.F.R. § 431.10(e)(3). Yet PBH seeks to do exactly that through its appeal—to reduce plaintiffs' services immediately, notwithstanding the NCDHHS's decision to comply with the injunction. Moreover, the Secretary's choice means that any judgment we could enter in PBH's favor would not provide PBH the redress it seeks: because the NCDHHS would remain bound by the preliminary injunction, so too would PBH as its agent. We therefore dismiss this appeal.

## I.

## A.

The case involves the delivery of Medicaid services to a class of North Carolina Medicaid recipients who suffer from chronic disabilities such as cerebral palsy, seizure disorders, mental retardation, and autism. While plaintiffs' conditions are serious enough to qualify them for institutional placement, they are able to live in community environments with the assistance of certain support services. For example, named plaintiff D.C. is a teenage Medicaid recipient with severe autism. Although he is verbally non-communicative and requires supervision at all times, D.C. is able to live at home with the help of professionals who teach him basic skills such as eating, dressing, and personal hygiene, and who provide temporary care for him when his parents are unavailable.

Plaintiffs receive these services through a type of Medicaid program known as "managed care Medicaid." In contrast to traditional fee-for-service Medicaid, where beneficiaries seek services directly from providers who are then reimbursed by the state, managed care Medicaid is a model in which the state contracts with a managed care organization ("MCO"), which oversees the delivery of services to beneficiaries in exchange for a fixed, prospective payment from the state for each

enrollee. *See Medicaid Program; Medicaid Managed Care: New Provisions*, 67 Fed. Reg. 40,989, 40,989 (June 14, 2002).

In this case, PBH is the MCO that manages the delivery of plaintiffs' Medicaid services, and Shipman is PBH's director.[1] More specifically, PBH is party to a contract with the NCDHHS under which PBH provides managed care to roughly 675 disabled individuals, including plaintiffs, as part of a program known as the North Carolina Innovations Waiver. The contract requires PBH to provide these enrollees with a list of certain covered health care services. PBH does so through a system in which it requires pre-authorization for non-emergency services like the skill-building and temporary care provided to plaintiff D.C. To obtain authorization, enrollees and their guardians meet each year with their physicians and a PBH employee to design an individual support plan identifying the services that the enrollee needs. The identified services are then submitted to PBH for approval. Once an enrollee's services are authorized, the contract provides that if PBH reduces or terminates those services, PBH must provide the enrollee with certain notice and appeal rights described in 42 C.F.R. §§ 438.400-.424.

As part of its pre-authorization process, PBH sets annual "base budget" amounts for each enrollee—the maximum level of funding that is available for certain non-emergency services. Prior to 2011, PBH set plaintiffs' base budget amounts using a benchmark system that was intended to tailor the amount of funding an enrollee could receive to his or her medical needs. In light of increasing service requests and budget shortfalls, however, PBH designed a new system, which established different funding categories for enrollees based on factors such as the enrollee's needs, safety risk, age, and place of living.

---

[1]For ease of reference, we generally refer to PBH and Shipman collectively as PBH.

Pursuant to this updated system, PBH sent letters to Innovations Waiver enrollees in March and April of 2011 informing them of their newly assigned base budget amounts. For some enrollees—in particular, the five named plaintiffs and the members of the class eventually certified by the district court—the letter indicated that their previous base budget amounts would be reduced. The letter also stated that the new base budget amounts would be "the maximum amount of base service funds that can be authorized in your Individual Support Plan" and that PBH would be in contact to develop their next plan.

To illustrate, D.C.'s parents received a letter from PBH informing them that D.C.'s base budget would be reduced from $47,588.52 to $18,799.60 in graduated steps beginning on July 1, 2011. The letter contained no information on how to appeal or challenge the reduced amount. As a result, even though D.C. was approved on April 21, 2011 to receive $43,579.52 worth of skill-building and temporary care services, D.C.'s mother eventually signed a new plan (under what she states were threats that PBH would terminate *all* of D.C.'s services) reducing D.C.'s services to comply with his new budget. Under the new plan, D.C.'s services were reduced by seventy to one hundred hours per month from their prior levels. In order to maintain D.C.'s services at those prior levels and to avoid placing him in an institution, D.C.'s parents paid for his care directly out of their savings.

B.

On July 5, 2011, four Innovations Waiver enrollees filed a class action against Lanier Cansler, the Secretary of the NCDHHS;[2] PBH; and Shipman. A fifth enrollee, M.S., inter-

---

[2]After then-Governor Beverly Perdue named Albert Delia Acting Secretary of the NCDHHS in 2012, Delia was substituted for Cansler as the state defendant under Federal Rule of Civil Procedure 25(d). In January 2013, however, Pat McCrory succeeded Perdue as governor and named Aldona Zofia Wos Secretary of the NCDHHS—making Wos the current state defendant in the underlying action.

vened as a plaintiff in December 2011. The plaintiffs (now appellees) sought preliminary and permanent injunctions reinstating their services to previously authorized levels and enjoining defendants (and their agents) from reducing their services without complying with the notice and hearing requirements of the Medicaid statute and the Fourteenth Amendment.

The district court ruled on plaintiffs' motion for a preliminary injunction on March 29, 2012. Because the Medicaid regulations require an MCO to provide notice and hearing rights only when it has taken "action," 42 C.F.R. § 431.200(b), the court focused its attention on defendants' argument that the reduction of plaintiffs' budgets did not amount to "action" in the first place. The court noted that "action" is defined in relevant part as the "reduction, suspension, or termination of a previously authorized service," *id.* § 438.400(b). It then reasoned that PBH took "action" by reducing the plaintiffs' authorized service budgets and "communicat[ing] to [them] that as of July 2011, they must reduce or terminate certain services to comply with" those reduced budgets. The district court thus held that plaintiffs were entitled to the notice and appeal rights provided for by the Medicaid statute and the Fourteenth Amendment. The court further ruled that defendants had failed to comply with those requirements and accordingly granted the motion for a preliminary injunction.

On April 27, 2012, defendants PBH and Shipman filed a timely notice of their interlocutory appeal of the district court's order. The deadline to appeal expired fourteen days later, *see* Fed. R. App. P. 4(a)(3), with no notice filed by the remaining defendant, the Secretary of the NCDHHS.

## II.

PBH contends that "the narrow legal question" before us is "whether the budget communications that PBH sent to [plain-

tiffs] in March and April 2011 constituted agency 'action,' as that term is defined in 42 C.F.R. § 438.400(b)." Appellants' Br. 23. But before reaching that question, we must first address the threshold issue of whether PBH may litigate this appeal to begin with, given that the NCDHHS has decided not to. For the reasons that follow, we conclude that the Medicaid statute and accompanying regulations preclude PBH from appealing in the absence of the NCDHHS.

A.

We begin with the relevant provision of the Medicaid statute and its attendant regulations. At the heart of our inquiry is Congress' pronouncement that each state must "provide for the establishment or designation of a single State agency to administer or to supervise the administration" of its Medicaid program, 42 U.S.C. § 1396a(a)(5), a command we shall refer to as the "single state agency requirement." In implementing this requirement, the U.S. Department of Health and Human Services has set forth the following regulation:

> If other State or local agencies or offices perform services for the Medicaid agency, they must not have the authority to change or disapprove any administrative decision of that agency, or otherwise substitute their judgment for that of the Medicaid agency with respect to the application of policies, rules, and regulations issued by the Medicaid agency.

42 C.F.R. § 431.10(e)(3).

As implemented through this rule, the single state agency requirement reflects two important values: an efficiency rationale and an accountability rationale. From an efficiency perspective, the requirement ensures that final authority to make the many complex decisions governing a state's Medicaid program is vested in one (and only one) agency. The requirement thereby avoids the disarray that would result if multiple

state or even local entities were free to render conflicting determinations about the rights and obligations of beneficiaries and providers. Thus, for example, where the designated state agency determines that a person is eligible for Medicaid benefits, administrative efficiency counsels that the agency itself, the individual, and other affected parties should be able to rely on the decision without worrying that some other state or local entity may later "change or disapprove" it, in violation of 42 C.F.R. § 431.10(e)(3). *See Forsyth Cnty. Bd. of Soc. Servs. v. Div. of Soc. Servs.*, 346 S.E.2d 414, 416-17 (N.C. 1986) (holding that under 42 C.F.R. § 431.10(e)(3), a county department of social services cannot sue seeking reversal of the single state agency's Medicaid eligibility determination).

With respect to the accountability rationale, the vesting of responsibility over a state's Medicaid program in a single agency safeguards against the possibility that a state might seek to evade federal Medicaid requirements by passing the buck to other agencies that take a less generous view of a particular obligation. As the Second Circuit has explained, "the reason for the requirement that a state designate a 'single State agency' to administer its Medicaid program . . . was to avoid a lack of accountability for the appropriate operation of the program." *Hillburn v. Maher*, 795 F.2d 252, 261 (2d Cir. 1986) (rejecting single state agency's argument that it did not need to comply with certain Medicaid regulations because of contrary decisions by another agency). As a result, a single state agency may not "diminish[ ] or alter[ ]" its Medicaid responsibilities based on the "action or inaction of other state offices or agencies." *Id.*

In sum, the single state agency requirement represents Congress's recognition that in managing Medicaid, states should enjoy both an administrative benefit (the ability to designate a single agency to make final decisions in the interest of efficiency) but also a corresponding burden (an accountability regime in which that agency cannot evade federal require-

ments by deferring to the actions of other entities). *See San Lazaro Ass'n v. Connell*, 286 F.3d 1088, 1100-01 (9th Cir. 2002) (noting that single state agency requirement ensures "systemwide efficiency" and "systemwide accountability"). This does not mean, of course, that a single state agency may never delegate responsibilities to other entities. Such agency relationships are expressly contemplated, for example in the context of MCOs like PBH that manage the provision of Medicaid on the state's behalf. *See* 42 C.F.R. §§ 438.1(b), 438.6. But the single state agency requirement does mean that a delegation can go only so far: where the agency makes a final decision, it cannot be overridden by another state or local entity.

### B.

In this case, there is no dispute that North Carolina law designates the NCDHHS as the agency responsible for operating the state's Medicaid plan. N.C. Gen. Stat. § 108A-54. Nor is there any dispute that PBH is a "local political subdivision of the State," N.C. Gen. Stat. § 122C-116(a), which has contracted with the NCDHHS to operate a managed care Medicaid program on the state's behalf. Federal and state law thus interlock, establishing the following propositions: the NCDHHS is the "single State agency" with the final responsibility to administer the state's Medicaid program under 42 U.S.C. § 1396a(a)(5), and as a local subdivision of the state, PBH is forbidden to "change or disapprove any administrative decision" made by the NCDHHS pursuant to 42 C.F.R. § 431.10(e)(3).

The question, then, is whether PBH's appeal seeks to "change or disapprove" an "administrative decision" of the NCDHHS such that it is barred by § 431.10(e)(3). PBH contends that the answer is "no." It argues first that this appeal does not change or disapprove any NCDHHS decision at all because PBH and the NCDHHS still take "the same position in this litigation"—namely that they did not violate plaintiffs'

notice and hearing rights. Appellants' Reply Br. 22-23. But this contention misses the mark for a simple reason: it focuses on the wrong decision.

The agency decision that PBH seeks to disapprove is not the NCDHHS's ultimate position on the merits of the underlying case. It is the NCDHHS's decision not to appeal and thereby to comply with the preliminary injunction. The NCDHHS's decision to comply means that the injunction is binding not only on the NCDHHS itself, but also on the NCDHHS's "agents" and any who are in "active concert or participation" with it. Fed. R. Civ. P. 65(d)(2). There is thus no escaping the fact that the NCDHHS has effectively decided that it and PBH—which is obligated to manage plaintiffs' care in accordance with its contract with the NCDHHS—will provide plaintiffs with their prior level of services (or else notice and a hearing) until a final judgment permits otherwise. Yet the entire purpose of PBH's appeal is to overturn that decision: PBH seeks to reduce plaintiffs' services *immediately*, without providing notice or a hearing. We must therefore reject PBH's contention that this appeal does not "change or disapprove" any decision by the NCDHHS.

PBH responds that even if its appeal does seek to change or disapprove *some* decision made by the NCDHHS, the decision in question is not an "administrative decision of that agency" protected under § 431.10(e)(3), but rather a mere "litigation" decision. Appellants' Reply Br. 22. Again we disagree.

To start, we find no support for the notion that litigation decisions are somehow categorically precluded from constituting an "administrative decision" under the regulation. Although the phrase is not expressly defined in the relevant provisions, the plain meaning of an "administrative decision" of a single state Medicaid agency naturally encompasses decisions that pertain to the management of the state's Medicaid program. *See Random House Dictionary of the English Lan-*

*guage* 26 (2d ed. 1987) (defining "administrative" as "pertaining to administration" and "administration" as the "management of any office, business or organization"). No less than its decisions in other contexts, of course, an agency's litigation decisions can have substantial impacts on the management of a state's Medicaid program. One need look no further than this case to see how: the NCDHHS's choice to comply with the preliminary injunction means that absent the provision of notice and appeal rights, the state must provide a class of Medicaid beneficiaries their previously authorized level of services pending a final ruling from the courts.

Of course, our conclusion that the Secretary's decision not to appeal is an "administrative decision" protected from interference by another agency under § 431.10(e)(3) does not mean every litigation decision by a single state agency qualifies as such. But we do not need to list every example of an "administrative decision" in order to hold that where, as here, an agency's decision is tantamount to a substantial policy choice, the decision falls within the sphere of agency judgment covered by § 431.10(e)(3). After all, it can hardly be disputed that if the NCDHHS had issued a policy statement declaring that all PBH enrollees would be eligible to receive their prior level of services (or else a fair hearing) until a contrary judicial ruling, that choice would surely constitute an "administrative decision" that local agencies would not be permitted to "change or disapprove" under § 431.10(e)(3). The result should not be any different here simply because the Secretary made the same decision in response to litigation rather than before it. If anything, a decision made in the instant context should be entitled to even greater respect because it comes with the backing of a court order announcing a preliminary interpretation of federal law.

Our conclusion is all the more necessary when one considers the implications of PBH's opposing approach. If important litigation decisions made by a single state agency were not "administrative decisions" protected from challenge by

another agency, the resulting inefficiency and turmoil would be profound. Consider, for example, a case in which a single state agency agrees to a consent decree confirming the Medicaid eligibility of a group of citizens. PBH's position would imperil that decision by permitting any county Medicaid office or local MCO to embroil the courts in a collateral lawsuit seeking a reversal of the decree. Or consider the converse situation where the designated agency elects to litigate a Medicaid case rather than to settle. Under PBH's view of § 431.10(e)(3), the agency's choice to pursue the lawsuit could be subject to "change or disapprov[al]" by another state or local entity that would prefer to settle the matter on whatever terms that other entity deemed satisfactory. The result of PBH's interpretation would be a constant state of confusion in the litigation process in which parties (and judges) must not only attempt to argue (or decide) the merits of each case, but where they must first identify which of multiple state entities is even speaking with the state's final authority.

PBH's view would thus compromise both the efficiency and accountability rationales for the single state agency requirement. That requirement prevents improvident ends by arresting their beginnings. Put simply, by directing states to designate a single Medicaid agency the decisions of which may not be overridden by other state and local actors, the requirement prohibits precisely what PBH aims to achieve in this appeal: to place itself in the driver's seat and call the shots on how the state's Medicaid program is to be administered in the face of a clearly contrary decision by the NCDHHS. PBH's appeal thus contravenes 42 U.S.C. § 1396a(a)(5) and 42 C.F.R. § 431.10(e)(3), and must be dismissed.

## C.

The case for dismissal of the appeal is underscored not only by the single state agency requirement, but also by the fact that it follows from that very requirement that PBH is pushing

the court to issue an advisory opinion. For the Secretary's decision not to appeal means that PBH would remain bound by the preliminary injunction regardless of any decision this court might issue.

1.

A party seeking recourse must establish that it is "likely, as opposed to merely speculative, that [its] injury will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (internal quotation marks omitted). Of course, the elements of standing must be satisfied not just at the outset of a suit, but also on appeal. *See Bond v. United States*, 131 S. Ct. 2355, 2362 (2011).

In this appeal, PBH seeks relief in the form of a reversal of the district court's preliminary injunction. PBH argues that such a decision "would in no way be merely advisory" because once the injunction is reversed, PBH's injury will necessarily be redressed: that is, PBH will be free to reduce plaintiffs' services (or as PBH argues, their budgets) without first providing notice and hearing rights. Appellants' Reply Br. 27.

PBH is mistaken. Its problem lies again in the Secretary's choice not to appeal and to instead comply with the preliminary injunction while litigating the case through to final judgment. In that context, the question becomes whether the fact that the NCDHHS remains obligated to obey the injunction means that PBH would also be bound to comply regardless of any decision we might issue. Or, put slightly differently, the question is whether PBH—the NCDHHS's contractual agent with respect to plaintiffs' Medicaid services—may disregard the injunction even as PBH's principal is obligated to comply with it. For several reasons, we cannot countenance that result.

First, because the preliminary injunction binds the NCDHHS, so too must it bind PBH under ordinary operation

of the Federal Rules of Civil Procedure. Federal Rule of Civil Procedure 65(d)(2) dictates that every order granting an injunction is binding not only on named parties, but also on "the parties' . . . agents" as well as any others with whom they "are in active concert or participation." As the Supreme Court has explained, the purpose of this rule is to prevent defendants from "nullify[ing] a decree by carrying out prohibited acts through aiders and abettors." *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945). Echoing that purpose, the plaintiffs' motion in this case specifically requested preliminary injunctive relief against not just the defendants, but also their "agents . . . and all persons acting in concert or participating with them."

Applying Rule 65(d)(2) to this case, there is no dispute that PBH is an agent of the NCDHHS due to its contract to administer plaintiffs' Medicaid services on behalf of the state. Nor is there any question that PBH is acting in participation with the NCDHHS to that same end. Thus, PBH is restrained by the preliminary injunction through not one, but two channels: first, in its capacity as a named defendant, and second, in its capacity as an agent and co-participant of the NCDHHS with respect to plaintiffs' Medicaid services. To be sure, a decision in this appeal in PBH's favor could negate the former channel of restraint. But such a decision could in no way affect the latter channel because the NCDHHS's choice not to appeal means that the injunction remains binding on it—and, as a consequence of Rule 65(d)(2), so too its agent and co-participant PBH. *See Tenn. Ass'n of Health Maint. Orgs. v. Grier*, 262 F.3d 559, 565 (6th Cir. 2001) (holding that under Rule 65(d), consent decree issued against single state Medicaid agency was also binding on MCOs due to their agency relationship with the state); *U.S. ex rel. Rahman v. Oncology Assocs.*, 198 F.3d 502, 511 (4th Cir. 1999) (citing Rule 65(d) and holding that writ of mandamus issued against Medicare agency was also binding on non-party Medicare contractors).

There is another reason why we may not allow PBH to evade a preliminary injunction that continues to run against

the NCDHHS: the single state agency requirement. Recall that this requirement embodies an important accountability rationale: Congress's desire to prevent states from backsliding on their Medicaid obligations by deferring to the non-conforming actions of other agencies. *See Hillburn*, 795 F.2d at 260-61. To that end, 42 C.F.R. § 431.10(e)(1) provides that the single state agency "must not delegate . . . authority to [e]xercise administrative discretion in the administration" of the state's Medicaid plan to others. Another regulation, *id.* § 435.903(b), requires the agency to "[t]ake corrective action to ensure" the adherence of local agencies to the state's Medicaid program. The single state agency requirement thus forbids the result that PBH seeks on appeal: it bars the NCDHHS from escaping its legal responsibilities (*i.e.*, to obey the injunction) by acquiescing to the non-compliant actions of another agency like PBH.

In sum, PBH must show that it is likely, not just speculative, that a favorable decision will provide the redress it seeks. *See Lujan*, 504 U.S. at 561. Yet the binding effect of the preliminary injunction on PBH pursuant to Rule 65(d)(2) and the single state agency requirement makes it speculative at best whether a decision in this appeal would enable PBH to engage in the conduct that the district court enjoined.

2.

PBH asserts that any decision reversing the injunction as to it would *automatically* inure to the benefit of NCDHHS because "it is not logical to argue that an order that is reversed or vacated based on an erroneous interpretation of law would somehow still be enforceable against a party simply because that party did not also take an interlocutory appeal." Appellants' Reply Br. 25-26. If PBH were correct, there would be no redressability problem since a ruling in its favor would negate both channels through which it is restrained by the preliminary injunction: the injunction would no longer bind PBH either as a named defendant or as an agent of the NCDHHS.

But PBH is again mistaken. It is basic to appellate practice that a "judgment will not be altered on appeal in favor of a party who did not appeal"—a rule that applies even if "the interests of the party not appealing are aligned with those of the appellant." *Smith v. Dairymen, Inc.*, 790 F.2d 1107, 1109 (4th Cir. 1986) (quoting 9 *Moore's Federal Practice* ¶ 204.11[4], at 4-54 to -55 (2d ed. 1980)). Indeed, where "co-defendants are held liable below, and one appeals and one does not," if the district court's order is reversed as to the appealing party, "the party not appealing remains liable, despite the fact that the liability of each depends upon the same legal principles." *Id.*

We are thus powerless to provide the very relief that PBH needs: an order reversing the preliminary injunction as against both PBH *and* the NCDHHS. We lack that ability for good reason, too, because offering a non-appealing party the automatic benefit of any appellate decision won without its participation would produce an intractable free-rider problem, not to mention endless follow-on litigation by non-appealing parties to determine whether their interests are closely enough aligned with those of the appealing party to warrant the benefit of the appellate judgment. We accordingly reject PBH's contention that a decision in its favor would as a matter of course render the preliminary injunction unenforceable against the NCDHHS.[3]

---

[3]PBH further argues that even if this appeal would not automatically benefit the NCDHHS, a reversal would still redress PBH's injury by enabling the Secretary to file a motion in the district court for relief from the preliminary injunction pursuant to Federal Rule of Civil Procedure 60(b). But "a preliminary injunction is not a 'final judgment, order, or proceeding' that may be addressed by a motion under Rule 60(b)." *Prudential Real Estate Affiliates v. PPR Realty, Inc.*, 204 F.3d 867, 880 (9th Cir. 2000) (quoting Fed. R. Civ. P. 60(b)). Moreover, even if a Rule 60(b) motion were available, there is some question whether the Secretary would apply for such relief if given the chance. After all, the Secretary had the ability to appeal the preliminary injunction as a matter of right by simply filing a notice to that effect, but chose not to do so. In addition, even

### III.

On March 28, 2013, one week after oral argument and more than ten months after the Secretary's deadline to file a notice of appeal had expired, we received a motion from the Secretary seeking leave to file a "Memorandum in Response to Questions Raised at Oral Argument." In the motion, the Secretary sought the court's consent "to clarify [the NCDH-HS's] position to the extent it is relevant to the Court's further consideration of the matters presented in this case." Secretary's Mot. for Leave to File Mem. in Resp. to Questions Raised at Oral Arg. 4. Reflecting the unusual nature of its request as a non-party to this appeal, the Secretary filed the motion under Rule 2 of the Federal Rules of Appellate Procedure, which permits a court to "suspend any provision of [the Rules]" for "good cause." The Secretary did not specify which rules she would like us to suspend, but for the reasons that follow we find no "good cause" to suspend any rules at all.

To start, the Secretary points to nothing close to good cause for why this court should consider her views on the issues raised by this appeal ten months after her deadline elapsed to participate in it as a matter of right. The only explanation the Secretary offers is that the NCDHHS "did not anticipate prior to oral argument that this Court might view or interpret [its] decision not to . . . appeal as precluding an appeal by [PBH]." Secretary's Mot. for Leave to File Mem. in Resp. to Questions Raised at Oral Arg. 4. We find that explanation wanting.

---

if a Rule 60(b) motion were available for relief from a preliminary injunction, and even if the Secretary were to file such a motion, there is no guarantee that it would succeed. The remedy afforded by Rule 60(b) is an "extraordinary" one that is "only to be invoked upon a showing of exceptional circumstances." *Compton v. Alton S.S. Co.*, 608 F.2d 96, 102 (4th Cir. 1979). In any event, we need not (and may not) decide the ultimate outcome of any hypothetical Rule 60(b) motion filed by the Secretary. Our only point here is that PBH's theory—that a ruling in its favor will redress its injury by virtue of such a motion—is riddled with speculation.

For one thing, the NCDHHS has been aware of its responsibilities under the single state agency requirement since at least 2009, when it was the defendant in a Medicaid case that held that "[a]s North Carolina's 'single state agency,' . . . [the NCDHHS] may not disclaim its responsibilities under federal law by simply contracting away its duties." *McCartney v. Cansler*, 608 F. Supp. 2d 694, 701 (E.D.N.C. 2009). Thus, even though it is generally permissible for a single state agency to enter into a contractual relationship with an MCO, the Secretary was on clear notice that allowing such a contractor to take a particular action (i.e., an appeal)—while disavowing the opportunity to take the same action in the agency's own right—could be subject to attack. Even worse for the Secretary, plaintiff/appellees filed their brief in this case in August 2012, squarely arguing that the NCDHHS's failure to appeal should trigger dismissal of PBH's appeal. PBH responded to that argument in its reply brief two weeks later. The NCDHHS nowhere disputes that it was (or at least should have been) aware of both of these filings, yet it made no effort to address either one. It thus defies reason for the NCDHHS to suggest now, seven months after the issue was briefed and years after a related ruling against it in district court, that it was surprised by the panel's questions at oral argument.

More fundamentally, we decline to find good cause here because the basic rule from which the Secretary seeks relief is as easy to follow as it is widely known. That is, the NCDHHS's motion effectively asks for permission to participate in this appeal despite the fact that it failed to appeal in a timely fashion. Yet the NCDHHS is represented in this matter by the North Carolina Attorney General, a sophisticated and frequent litigant in this court. As such, the NCDHHS is surely aware of the time limit for filing an appeal, as well as the fact that this limit has been "treated as jurisdictional in American law for well over a century." *Bowles v. Russell*, 551 U.S. 205, 209 n.2 (2007). The NCDHHS must also know that there is even a special procedure to make things easier on entities that share

similar interests in an appeal: under Federal Rule of Appellate Procedure 3(b)(1), such parties "may file a joint notice of appeal" and "proceed on appeal as a single appellant." Thus, literally all the Secretary had to do to participate in this appeal, as it hopes to do now, was co-sign PBH's notice one year ago.

Why the NCDHHS failed to take such an easy step, we cannot say for certain. The NCDHHS suggests that it declined to appeal because doing so would have been "duplicative," Secretary's Mot. for Leave to File Mem. in Resp. to Questions Raised at Oral Arg. 3, but that answer only raises more questions. Duplicative in what sense? Surely not in terms of wasted effort, since the Secretary could simply co-sign PBH's papers. And surely not duplicative in the sense of "unnecessary," for the NCDHHS acknowledges that it will not automatically benefit from a ruling in PBH's favor, instead requiring the filing of a Rule 60(b) motion, a problematic course for all the reasons we have discussed. *See ante* at 17-18 n.3. In short, we find it dubious that the Secretary would think it permissible to allow some other litigant to be its stalking horse in this court, only then to seek leave to participate in the case long after the time for doing so had run. We recognize, of course, that there has been a change in administrations since the Secretary's failure to notice an appeal. But if we let a state off the hook for its decision not to appeal based on new electoral outcomes, what other rules would we be called upon to bend when the political winds shift and a new executive experiences buyer's remorse for decisions of the old? The better course by far is to enforce consistently for all litigants the time-honored rules that have long governed how an entity may participate in appeals in this court.

In the end, the Secretary's motion serves only to reinforce the weaknesses in PBH's appeal. For if, as PBH argues, the Secretary and PBH were truly in agreement all along that they did not wish to comply with the preliminary injunction, all the

Secretary had to do to make that position clear was join in PBH's appeal. That the NCDHHS did not take that simplest of steps indicates that it was actually making an administrative policy decision to comply with the injunction, which the single state agency requirement forbids PBH to overrule. Likewise, it is the Secretary's failure to file a simple notice of appeal that bars her late participation in this case.

Of course, our decision does not leave the Secretary without recourse. Quite the contrary. The Secretary is free to press her views on the merits when the permanent injunction is litigated in the district court, as well as in any subsequent appeal of such an injunction before this court. What the Secretary may not do, however, is participate in the instant appeal of the preliminary injunction, almost a year after the proper time for doing so has passed, in order to respond to supposedly surprising questions posed at oral argument that she should have known were on the way. The Secretary's motion is accordingly denied.

## IV.

Spanning hundreds of regulations across fourteen parts and scores of subparts in the Code of Federal Regulations, Medicaid is—to put it mildly—a complicated program to administer. Seen in that light, the single state agency requirement is a sensible measure aimed at eliminating the added layer of complexity that would result if primary actors and courts were required to ask in every case, "who actually speaks for the state?" Because of this requirement, we cannot permit PBH to override the NCDHHS's decision not to appeal, but to comply with, the preliminary injunction. One head chef in the Medicaid kitchen is enough.

The appeal is hereby dismissed.

*DISMISSED*